AO 106A (EDVA Version) (03/20) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Eastern District of Virginia

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | )   Case No.   4:20sw 28 |
| ACCOUNTS DESCRIBED IN ATTACHMENT A STORED AT PREMISES OPERATED, MAINTAINED, OR CONTROLLED BY A COMPANY DESCRIBED IN ATTACHMENT A | ) ) ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See attachment A

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 1952 | Use of interstate facility to promote prostitution |
| 18 U.S.C. § 1591(a) | Sex trafficking |

The application is based on these facts:

See affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Reviewed by AUSA/SAUSA

AUSA Eric M. Hurt

*Printed name and title*

HSI Special Agent Jason Brumbelow

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____attested to by telephone_____   *(specify reliable electronic means)*.

Date:   March 23, 2020

Douglas E. Miller, USMJ
2020.03.23 14:04:22 -04'00'

*Judge's signature*

City and state:   Norfolk, Virginia

Douglas E. Miller, United States Magistrate Judge

*Printed name and title*

Print        Save As...        Attach        Reset

IN THE UNITED STAES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Newport News Division

| | |
|---|---|
| IN RE SEARCH OF:  ) | |
| ACCOUNTS DESCRIBED  ) | |
| IN ATTACHMENT A  ) | |
| STORED AT PREMISES OPERATED,  )    4:20sw__28 | |
| MAINTAINED, OR CONTROLLED BY  ) | |
| A COMPANY DESCRIBED IN  ) | |
| ATTACHMENT A  ) | |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION
### FOR A SEARCH WARRANT

I, Jason Brumbelow, your Affiant, being first duly sworn, hereby depose and

state as follows:

## I.     INTRODUCTION

1.     I make this affidavit in support of an application for a search warrant under 18

U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google, LLC (hereinafter

"Google") to disclose to the government records and other information, including the contents of

communications, associated with the above-listed email accounts that are stored at premises

owned, maintained, controlled, or operated by Google, a company headquartered at 1600

Amphitheatre Parkway, Mountain View, CA 94043.  The information to be disclosed by Google

and searched by the government is described in the following paragraphs and in Attachments A

and B.

2.     I am a Special Agent with the United States Department of Homeland

Security, U.S. Immigration and Customs Enforcement ("ICE"), Homeland Security

Investigations (HSI).  I am assigned to the HSI office in Norfolk, Virginia.  I have been

employed as a Special Agent with HSI since January of 2008.  I am currently assigned

to work on the Hampton Roads Human Trafficking Task Force within the Norfolk,

1

Virginia Division of HSI. My experience includes the investigation of cases involving human trafficking and the use of facilities of interstate and foreign commerce in furtherance of such crimes. I am a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program and the U.S. Immigration and Customs Enforcement Special Agent Training Program. I have received training in the investigation of criminal violations of federal law within the jurisdiction of HSI, and I have received specialized training in the investigation of human trafficking. Additionally, I have received training and gained experience in arrest procedures, search warrant applications, the execution of searches and seizures, and various other criminal laws and procedures.

3.      I have received training in interviewing techniques, arrest procedures, search warrant applications, surveillance, and a variety of other investigative tools available to law enforcement officers. I have conducted and participated in investigations related to human trafficking which have resulted in arrests and convictions.

4.      The facts in this affidavit come from my personal observations, my training and experience, and written and verbal information obtained from other agents, law enforcement, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that evidence, fruits, and instrumentalities, as described in Attachment B of this affidavit, currently exist at the place and in the things noted in Attachment A, and that such evidence constitutes property involved in, or traceable to,

2

violations of 18 U.S.C. § 1591 (Sex Trafficking through Fraud, Force, or Coercion) and 18 U.S.C. § 1952 (travel across state lines or use of a facility of interstate commerce to promote prostitution).

## II.  LEGAL AUTHORITY

6.       18 U.S.C. § 1591(a), in pertinent part, prohibits whoever knowingly, in or affecting interstate or foreign commerce, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person, knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion or any combination of such means will be used to cause the person to engage in a commercial sex act.

7.       The term "coercion" means--(A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of law or the legal process.

8.       The term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person.

9.       The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

10.      18 U.S.C. § 1952 prohibits a person from using "the mail or any facility in interstate or foreign commerce with the intent to (1) distribute the proceeds of any unlawful activity or ….(3) otherwise promote, manage, establish, carry on, or facilitate the promotion,

3

management, establishment, or carrying on of any unlawful activity and thereafter performs or attempts to perform an act described in (1) or (3)."   In pertinent part, "unlawful activity" means any business enterprise involving prostitution offenses in violation of the laws of the State in which they are committed or of the United States.

### III.    INFORMATION ON GOOGLE, INC.

11.    The Google Email Premises are email accounts which are hosted by Google, Inc. (hereinafter, the "email provider").  In my training and experience, I have learned that email providers provide a variety of on-line services, including email access, to the general public. The email provider allows subscribers to obtain email accounts at the domain name gmail.com. Subscribers obtain an account by registering with the email provider.  During the registration process, the email provider asks subscribers to provide basic personal information.  Therefore, the computers of the email provider are likely to contain stored electronic communications (including retrieved and retrieved email for the email provider's subscribers) and information concerning subscribers and their use of the email provider's services, such as account access information, the email transaction information, and account application information.

12.    In general, an email that is sent to the email provider's subscriber is stored in the subscriber's "mail box" on the email provider's servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on the email provider's servers indefinitely.

13.    When the subscriber sends an email, it is initiated at the user's computer, transferred via the Internet to the email provider's servers, and then transmitted to its end destination.  The email provider often saves a copy of the email sent.  Unless the sender of the

email specifically deletes the email from the email provider's server, the email can remain on the system indefinitely.

14.     A sent or received email typically includes the content of the message, source and destination addresses, the date and time at which the email was sent, and the size and length of the email. If an email user writes a draft message but does not send it, that message may also be saved by the email provider but may not include all of these categories of data.

15.     A subscriber of the email provider can also store files, including emails, address books, contact or buddy lists, calendar data, pictures, and other files, on servers maintained and/or owned by the email provider.

16.     In my experience, subscribers do not routinely copy emails stored in their email account in order to store the emails on a home computer or other location, although it is possible to do so. This is particularly true when they access their email account through the web, or if they do not wish to maintain particular emails or files in their residence.

17.     In general, email providers like Google ask each of their subscribers to provide certain personal identifying information when registering for an email account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).

18.     Email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the email provider's website), and other log files that reflect usage of the account.

5

In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

19.     In some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

20.     In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, emails in the account, and attachments to emails, including pictures and files. Online bills and other receipts will often be sent to an email account, providing further user attribution evidence tied to the account and demonstrating who is ultimately committing the crimes under investigation.

## IV.     OPERATION OF COMMERCIAL SEX ENTERPRISES

21.     Based on my training and experience described above, I am familiar with the manner in which individuals conduct illegal business, including human sex trafficking, and the methods, language, and terms that are related to those activities. Specifically, I know that:

22.     Individuals who organize, monitor and/or operate an illegitimate escort business/commercial sex service are commonly referred to as pimps. It is the pimp's job to control, organize, monitor, and provide security for his commercial sex workers. Pimps often

maintain control of their commercial sex workers through physical violence and often use firearms to threaten commercial sex workers and to intimidate other pimps and customers.

23.     Commercial sex remains largely a cash-based business and pimps are known to store or carry significant amounts of cash. A pimp will commonly receive all of the cash proceeds of the commercial sex business from his commercial sex workers. The pimp uses the commercial sex worker's earnings to provide her with food, housing, transportation and clothing. This clothing usually consists of high-heeled shoes and small, revealing and tight-fitting items more akin to lingerie. The pimp will also often possess and provide condoms, sexual lubricants, and other commercial sex-related items. In addition, pimps frequently purchase and possess illegal narcotics to provide to their commercial sex workers, who are often addicted to illegal narcotics.

24.     The housing may be temporary or permanent to include private homes, apartments, and/or hotel rooms. A pimp usually prohibits his commercial sex workers from possessing enough cash to survive without the pimp.

25.     Commercial sex workers meet customers for sex through "in calls" or "out calls." The term "in call" refers to a circumstance in which the customer travels to the commercial sex worker. The term "out call" refers to a situation in which the commercial sex worker travels to the customer's location.

26.     When a commercial sex worker travels to an "out call," it is standard practice for either the pimp or a driver employed by the pimp to transport the commercial sex worker to the call. This allows for the pimp to control, monitor, and provide security for his commercial sex worker. It is also common for the driver or pimp to remain in the area of the call for the duration of the sex act.

27.     The commercial sex worker is often required to turn over the money she receives

7

for the sex act to the pimp after the end of the call.

28.     It is common for individuals involved in commercial sex to create and post online commercial sex advertisements through websites such as Skipthegames.com. Skipthegames.com has users create an account. Users must provide Skipthegames.com with a valid email address in order to create an account. An ad on Skipthegames.com can be posted and reposted for free. When an ad is posted, an email can be sent to the registered email account providing notification that the ad was successfully uploaded. An email account can also receive other updates and notifications from Skipthegames.com.

29.     It is common for individuals involved in commercial sex to book hotel rooms online through various services such as Hotwire.com, Travelocity, or directly with the hotel's website. Such traveling websites and hotels often require registration information, including email addresses. After booking hotel rooms online, it is common for an email to be sent to the registered email address, confirming the reservation. It is also common for hotels to send bills electronically to the email address provided by the user.

30.     Individuals involved in commercial sex often travel to the commercial sex dates via car services such as Uber and Lyft. Such car services require users to provide email accounts and credit card information upon registration. After a trip is completed, such car services often times send emails to the registered email account providing the details of the trip taken and the amount of money the trip cost.

31.     It is common for individuals engaged in commercial sex to utilize cellular telephonic communications, including text messaging and other mobile applications, to further their criminal activities by coordinating customer appointments, recruitment of other females, and other efforts of co-conspirators. It is known that individuals engaged in commercial sex will use other electronic means to communicate with customers and prostitutes. These methods

8

include various social networking sites (i.e. Facebook and Instagram), e-mail services, instant messaging services, and other internet-based sites.

32.     Individuals who engage in commercial sex utilize other electronic devices such as laptop computers, tablet computers, desktop computers, handheld devices (i.e. smartphone, iPhones, iPods) to further their criminal activities by coordinating customer appointments and customer data, posting commercial sex ads online, booking hotel rooms online, recruitment of commercial sex workers, and information about and direction for commercial sex workers and co-conspirators.

33.     When individuals are on social networking sites such as Facebook, Instagram, and others, the user is required to provide an email address upon registration. After providing an email address, updates may be sent to that user's registered email account. Such updates include notifications regarding friend requests, comments posted by others, and "likes" of various photos or status updates posted. Thus, email accounts contain information related to what was posted on various social networking sites.

## VI. PROBABLE CAUSE

### A.     Discovery of Commercial Sex Activities

34.     On or about July 5, 2019, Williamsburg Police Department (WPD) officers responded to a call regarding the assault of two women at a hotel in Williamsburg, VA. According to WPD incident reports, the responding WPD officers encountered JANE DOE 1 and JANE DOE 2 lying next to each other on the bed inside room 447 of the hotel. The WPD incident report also noted that JANE DOE 1's face was "bloody," and JANE DOE 2 had bruises and scratches all over her legs and face.

35.     During this encounter, JANE DOE 1 informed a WPD officer that she and JANE DOE 2 were staying in room 447 of the hotel. An individual called "TRICK" (later identified

as EVAN COLE) was staying in room 445. The incident report noted that rooms 447 and 445 are next to each other. The report also stated that room 447 and 445 are connected to each other via an "inside door." JANE DOE 1 said both rooms were reserved in JANE DOE 2's name.

36.     JANE DOE 1 described TRICK as an African-American male with triangle tattoos above and under his eyes. A WPD officer noted that an individual named Evan COLE recently left a Virginia Identification card at the scene of a call for service near this hotel. The WPD officer noted that COLE had triangle tattoos above and under his eyes in the photograph on this identification card.

37.     The WPD incident report noted that medics arrived at the hotel to evaluate JANE DOE 1 and JANE DOE 2. The medics recommended that JANE DOE 1 and JANE DOE 2 should go to the hospital for further evaluation. The WPD incident reported stated that both JANE DOE 1 and JANE DOE 2 refused transportation to a hospital.

**B     On Scene Interview of JANE DOE 1 And JANE DOE 2 on July 5, 2019**

38.     The WPD incident report stated that WPD officers interviewed JANE DOE 1 and JANE DOE 2 at the hotel on July 5, 2019. Among other things, JANE DOE 1 and JANE DOE 2 said the following:

a.      JANE DOE 1, JANE DOE 2, and COLE were hanging out in room 447 at 0300 on July 5, 2019. COLE began to yell at JANE DOE 1 and JANE DOE 2. COLE said JANE DOE 1 and JANE DOE 2 were "liars." COLE also said JANE DOE 1 and JANE DOE 2 needed to, "give him his money back."

b.      COLE began assaulting JANE DOE 2. COLE instructed JANE DOE 1 to help him kill JANE DOE 2. JANE DOE 1 refused to help COLE. COLE then "punched, choked, hit, gagged and tied up" JANE DOE 1. COLE used bandannas, jeans, socks, and underwear to gag and tie up JANE DOE 1.

c.      Later that morning, COLE continued to call JANE DOE 1 and JANE DOE 2 "liars." COLE continued to assault JANE DOE 1. JANE DOE 1's nose and mouth bled as a result of this assault.

d.  COLE then informed JANE DOE 1 and JANE DOE 2 that he was going to drown JANE DOE 2 in the bathtub and "destroy the evidence." COLE also claimed that he was going to kidnap JANE DOE 1 and take her to Atlanta. COLE told JANE DOE 1 that he would hurt them more if they screamed.

e.  JANE DOE 1 managed to remove her gag and scream for help. COLE left the room after he attempted to replace JANE DOE 1's gag. COLE took $100 from JANE DOE 1 and $100 from JANE DOE 2 as he left the hotel room. COLE also took JANE DOE 1 and JANE DOE 2's cellular telephones.

f.  Sometime later, COLE returned to room 445. COLE took items from room 445 and threw them into room 447. As COLE threw these items into room 447, COLE said he would make sure that JANE DOE 1 and JANE DOE 2 went to jail.

39.  The WPD incident report did not distinguish which statements JANE DOE 1 and JANE DOE 2 made in the above interview. However, the reported noted that JANE DOE 1 answered most of the responding officer's questions. The incident report also stated that JANE DOE 1 and JANE DOE 2 did not want to press charges on COLE for fear of reprisals because COLE is a high-ranking member of the Bloods Gang.

## C.  Second Interview of JANE DOE 1 and JANE DOE 2 on July 5, 2019

40.  On July 5, 2019, an investigator from the Virginia State Police (VSP) interviewed JANE DOE 1 and JANE DOE 2 at the hotel. The WPD incident report stated that most of the interviews were recorded. However, the VSP investigator's audio recorder failed to capture the entire interviews. Among other things, JANE DOE 1 and JANE DOE 2 said the following.

a.  Both JANE DOE 1 and JANE DOE 2 were afraid to cooperate with law enforcement out of fear of reprisals from COLE. COLE was a member of the Bloods Gang, and COLE had previously threatened JANE DOE 1, JANE DOE 2, and their families.

11

b.      JANE DOE 1 and JANE DOE 2 said they had sex with several men in exchange for money while they were staying at the hotel. This commercial sex took place inside hotel rooms 445 and 447. COLE used proceeds of this commercial sex to obtain cigarettes and pay for the hotel rooms. JANE DOE 1 and JANE DOE 2 also said COLE robbed at least one of their sex customers while they were engaged in commercial sex at the hotel.

## D.   Post-Arrest Statements by made by COLE on July 11, 2019

41.     On July 11, 2019, York Poquoson Sheriff's Office (YPSO) deputies, a VSP investigator, and officers from the WPD arrested COLE for Abduction, Use of a Firearm in the Commission of a Felony, Possession of a Firearm by a Convicted Felon, Brandishing a Firearm, and Trespassing. During this arrest, COLE stated that he did not wish to make any statements. The incident report also noted that the arresting officers did not attempt to question COLE. However, COLE made several spontaneous statements during his booking and processing.

42.     The incident reported stated that COLE said he was at the hotel with "two white girls." COLE stated that he had a lot of sex and used drugs while at the hotel with the "two white girls." COLE also referred to one of the "white girls" by JANE DOE 1's first name. COLE also said he would "take an assault charge" since he had assaulted one of the "white girls."[1]

## E.   Interview of JANE DOE 2 on December 2, 2019

43.     On December 2, 2019, a WPD detective interviewed JANE DOE 2. Among other things, JANE DOE 2 said the following:

a.      JANE DOE 2 said COLE became "controlling" soon after JANE DOE 2 met him. At the time that law enforcement encountered her at the motel, JANE DOE 2 said COLE was holding her against her will.

b.      COLE forced JANE DOE 2 to engage in commercial sex acts. JANE DOE 2 referred to the commercial sex acts as "dates." These dates happened in the motel in which law enforcement encountered JANE DOE 2. JANE DOE 2 said

she had approximately 20 "dates" during the week she stayed at the motel with COLE. COLE collected the money that JANE DOE 2 earned from these "dates." JANE DOE 2 confirmed that she and COLE stayed in two rooms on the 4th floor of the motel.

c.  COLE instructed JANE DOE 2 and JANE DOE 1 on how to interact with sex customers. COLE instructed JANE DOE 2 to grab a sex customers genitals at the entrance of the hotel room. COLE also told JANE DOE 2 to tell the sex customers to touch her before they (sex customers) entered the motel room. According to JANE DOE 2, COLE said these were both ways to ensure that a sex customer was not an undercover law enforcement officer.

d.  JANE DOE 2 said COLE would post commercial sex advertisements for her on the internet. COLE would schedule "dates" with sex customers for JANE DOE 2. COLE communicated with sex customers through text messages.

e.  COLE robbed some of JANE DOE 2's sex customers. These robberies took place in the motel parking lot or inside JANE DOE 2's motel room.

f.  COLE became suspicious that JANE DOE 1 and JANE DOE 2 were hiding drugs from him. COLE checked JANE DOE 2's vagina to ensure that she (JANE DOE 2) was not hiding drug inside her (JANE DOE 2's) vaginal cavity. COLE also pulled JANE DOE 2's intrauterine device (IUD) out of JANE DOE 2's vagina because COLE mistook the IUD for narcotics.

g.  COLE assaulted JANE DOE 2 multiple times while they were staying in the motel. COLE whipped JANE DOE 2 with a telephone charger. COLE also broke JANE DOE 2's cheekbone during one physical assault.

## F.   Interview of A.H. on December 23, 2019

44.   On December 23, 2019, your affiant and a WPD Detective interviewed A.H.

A.H. is an employee of the motel where law enforcement encountered JANE DOE 1 and JANE

DOE 2. Among other things, A.H. said the following:

a.  A.H. was familiar with COLE. COLE stayed in rooms 445 and 447 at the motel during the summer of 2019. During COLE's stay, A.H. cleaned rooms at the motel. A.H. said COLE tried to recruit her into prostitution during his stay at the motel.

13

b.   COLE approached A.H. while she was working at the motel. COLE told A.H. that he (COLE) had two guns in his motel room. COLE told A.H. that she was pretty, and COLE could help A.H. make a lot of money. COLE also offered to procure drugs for A.H.

c.   On another occasion, COLE entered a motel room that A.H. was cleaning. As he entered the motel room, A.H. said COLE was speaking to someone through an iPad. A.H. heard COLE say, "This is the girl I was telling you about" to the person he (COLE) was speaking to on the iPad. A.H. said COLE had the iPad's camera pointed at her when he (COLE) made this statement. COLE then asked A.H. if she had thought about his (COLE's) offer. COLE then asked A.H. if a man had ever blown cocaine, "up her ass." COLE again offered to procure drugs for A.H.

## G.   Review of Registry Information from the Motel

45.   On December 23, 2019, your affiant and a WPD Detective retrieved registration information from the motel for room 445 and 447 during the time that law enforcement encountered JANE DOE 1 and JANE DOE 2. Among other things, a review of these records revealed the following information:

a.   A woman reserved rooms 445 and 447 from June 30, 2019 until July 5, 2019. The woman who reserved rooms 445 and 447 provided the same address to the motel that JANE DOE 2 provided to law enforcement on a prior encounter. Additionally, there were two names provided on these room registrations. One of these names was the name of JANE DOE 2. The other name had the same first name as JANE DOE 2 but a different last name.

## H.   Review of Photographs of JANE DOE 1 and JANE DOE 2

46.   A WPD officers took photographs of JANE DOE 1 and JANE DOE 2 after they responded to the motel on July 5, 2019. On January 19, 2020, your affiant reviewed these photographs. Among other things, your affiant saw the following in these photographs.

a.   There were bruises on JANE DOE 2's left shoulder. JANE DOE 2 had multiple red lines across her upper back. JANE DOE 2 also had multiple bruises on both sides of her upper legs. JANE DOE 2 had bruises on her right, upper cheek and on the left side of her jaw.

14

b.   There was dried blood on JANE DOE 1's nose and upper lip.  There were also bruises on JANE DOE 1's left, upper arm and left shoulder.

## K.      Review of COLE's Recorded Jail Calls

47.   During this investigation, your affiant obtained copies of recorded telephone calls that COLE made from the Virginia Peninsula Regional Jail (VPRJ).  Among other things, a review of these calls revealed the following information:

a.   On July 21, 2019, COLE called an unidentified male (UM).  COLE tells the UM that "they" found the firearm.  COLE also stated that the "feds" wanted to take over his case.  COLE also confirmed that he was facing abduction and sex trafficking charges.

b.   On January 10, 2020, COLE called JANE DOE 1.  COLE identified himself as "Trick" at the beginning of the call.  COLE referred to another individual as "KILLA."  COLE and JANE DOE 1 state that "KILLA" was in New York. COLE told JANE DOE 1 that no one has ever put this many charges on him and left him out to dry.  COLE said JANE DOE 1 "pissed him off" so bad he wanted to punch her in her mouth.  COLE said he and JANE DOE 1 would be friends, or COLE would, "tear the shit" out of JANE DOE 1.  COLE said he was facing "abduction" and "sex trafficking" charges.  COLE told JANE DOE 1 that she was being "disloyal" to him.  COLE told JANE DOE 1 that she was a "commodity" wherever she went.  COLE told JANE DOE 1 that she was either a "head," "a smoker," or a "piece of ass."

c.   On January 10, 2020, COLE called JANE DOE 1.  COLE told JANE DOE 1 that JANE DOE 2 just walked past him in "intake."  COLE stated that JANE DOE 1 had "guaranteed" him that JANE DOE 2 was in New York.  COLE said, "it's over for me" and that he was "scared shitless" in reference to JANE DOE 2. COLE told JANE DOE 1, "We've got to fix this.  I'm not going to let her burn me like that."

d.   On January 11, 2020, COLE called JANE DOE 1.  COLE told JANE DOE 1 that he talked to the "other person" face to face.  JANE DOE 1 asked COLE if everything was "good."  COLE replied, "no."  COLE stated that "she" told him he was going to jail.  JANE DOE 1 told COLE that she received a text saying "DHS" wanted to talk to her about COLE.  COLE asked JANE DOE 1 why. JANE DOE 1 replied that they handle "that."

48.     On February 15, 2020, your affiant reviewed incident reports regarding COLE's arrest by the YPSO on July 11, 2019. Based on this review, your affiant determined that the YPSO arrested COLE for various charges, to include a felon in possession of a firearm. The YPSO incident report also stated that COLE pointed a firearm at a hotel employee, prior to his arrest.

49.     On January 21, 2020, JANE DOE 1 informed your affiant that COLE referred to JANE DOE 2 as "KILLA." JANE DOE 1 advised your affiant that if I listened to COLE's recorded jail calls, your affiant would hear COLE and JANE DOE 1 refer to JANE DOE 2 as "KILLA."

50.     On February 13, 2020 your affiant searched for JANE DOE 2 in law enforcement databases. This search revealed that law enforcement arrested JANE DOE 2 on January 10, 2020 for a probation violation. Your affiant also confirmed with WPD that JANE DOE 2 was detained in the VPRJ after this arrest. This is the same jail in which COLE was detained on January 10, 2020.

## L.     Interview of JANE DOE 2 on February 5, 2020

51.     On February 5, 2020, a detective from WPD interviewed JANE DOE 2 at VPRJ. Among other things, JANE DOE 2 said the following:

a.      JANE DOE 2 was booked into VPRJ on January 10, 2020. While she was in intake, COLE approached JANE DOE 2. COLE offered JANE DOE 2 $5,000 to "plead the 5th" in court. JANE DOE 2 said COLE then began to instruct her on how to "plead the 5th."

## VII.  IDENTIFICATION OF TARGET ACCOUNTS

### A.   Review of Online Advertisements on skipthegames.com

52.   During this investigation, your affiant received the titles and contact telephone numbers for some online commercial sex advertisements regarding JANE DOE 1 and JANE DOE 2 from the WPD.  One of these advertisements had a post date of July 4, 2019, the title "Sexy Lil Snowbunny," and the contact telephone number 757-XXX-8778.  The other advertisement had a post date of July 5, 2019, the title "Thick Creamy Vanilla Swirl," and the contact telephone number 757-XXX-9094.  These advertisements were posted on the website skipthegames.com.

53.   On October 30, 2019, I requested any information that the company that manages the skipthegames.com website could provide regarding the above online postings on skipthegames.com.  On October 30, 2019, your affiant received information from the company that manages the website called skipthegames.com regarding these online postings.  Among other things, your affiant received the following information regarding these postings.

a.   There was one account on skipthegames.com that used telephone number 757-XXX-8778.  The email address associated with this account was echotree71@gmail.com.  The user established this account on skipthegames.com on May 11, 2019.  There were several additional telephone numbers associated with this account.  On June 9, 2019, the user of this account changed the account's telephone number to 757-XXX-0070.

b.   There was another account established on skipthegames.com on May 27, 2019, that used telephone number 757-XXX-0070.  The email address associated with this account was luciocole751@gmail.com.

c.   The user of the skipthegames.com account associated with email address echotree71@gmail.com posted approximately 26 commercial sex advertisements in Williamsburg, VA between June 30, 2019 and July 5, 2019.  The titles of these commercial sex advertisements, posted for Williamsburg, VA, were either "Sexy Lil Snowbunny" or "Thick Creamy Vanilla Swirl."

17

    d.     The user of the skipthegames.com account associated with email address luciocole751@gmail.com posted approximately 11 commercial sex advertisements in Williamsburg, VA between June 5, 2019, and June 10, 2019.

## B.    Interview of JANE DOE 1 on January 21, 2020

    54.    On January 21, 2020, your affiant and a VSP Investigator interviewed JANE

DOE 1.  Among other things, JANE DOE 1 said the following;

    a.     JANE DOE 1 met COLE in late March of 2019.  After she met him, COLE recruited JANE DOE 1 into engaging in commercial sex for COLE.  COLE created and posted online commercial sex advertisements for both JANE DOE 1 and JANE DOE 2.  COLE communicated with sex customers that responded to these online commercial sex advertisements.  COLE negotiated prices for commercial sex with sex customers for JANE DOE 1 and JANE DOE 2.  COLE also scheduled "dates" between sex customers and JANE DOE 1 and JANE DOE 2.  COLE used the money that JANE DOE 1 earned from commercial sex to pay for hotel rooms and purchase drugs, among other things.  COLE told JANE DOE 1 that he had worked as a pimp since he was 13 years old.

    b.     JANE DOE 1 said luciocole751@gmail.com was one of COLE's email accounts.  JANE DOE 1 created email account echotree71@gmail.com.  COLE used email account echotree71@gmail.com to post commercial sex advertisements on skipthegames.com.  JANE DOE 1 said telephone numbers 757-XXX-0070 and 757-XXX-8778 were both telephone numbers that she created with the telephone application called TextNow.  COLE used these numbers to communicate with customers that responded to commercial sex advertisements that COLE posted for JANE DOE 1 and JANE DOE 2.

    55.    Your affiant served Google with a preservation request pursuant to 18 U.S.C. §

2703(f), requiring Google to preserve all information associated with email accounts

luciocole751@gmail.com and echotree71@gmail.com on March 6, 2020.

## VIII.  CONCLUSION

    56.    Based on the foregoing, there is probable cause to believe that the federal

criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B of this Affidavit, are located within the accounts, described in Attachment A.

57.     This court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711(3) and 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the court is "a district court of the United States... that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(I).

58.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Reviewed by:

Eric M. Hurt
Assistant United States Attorney

FURTHER AFFIANT SAYETH NOT.

Jason E. Brumbelow, Special Agent
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
Homeland Security Investigations

Subscribed and sworn to before me on March 23, 2020

Douglas E. Miller, USMJ
2020.03.23 14:05:45 -04'00'

Douglas E. Miller
UNITED STATES MAGISTRATE JUDGE

19

## ATTACHMENT A

## DESCRIPTION OF LOCATION TO BE SEARCHED:

This warrant applies to information associated with the following accounts:

      **a.**  luciocole751@gmail.com

      **b.**  echotree71@gmail.com

The above accounts are stored at premises owned, maintained, controlled, or operated by Google, LLC., a company headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043.

## ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED:

**1.   Information to be disclosed by Google**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, Google is required to disclose the following information to the government for the account listed in Attachment A:

a.   All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, alternate email address, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

b.   The contents of any and all emails stored in the subscriber's Google account;

c.   All records or other information stored by an individual using the account, including address books, contact and buddy lists, pictures, and files;

d.   Any Google Voice telephone number and associated records to include contact list, call detail records, and content of text messages;

e.   Associated Google Hangouts to include contact lists and content of all messages;

21

f.   All records pertaining to communications between Google and any person regarding the account, including contacts with support services and records of actions taken.

2.   **Information to be seized by the government**

a.   All information described above in Section I, including correspondence, records, documents, photographs, videos, e-mail, chat logs, and electronic messages that constitutes evidence of violations of 18 U.S.C. Section 1591 (sex trafficking by force, fraud, or coercion); Section 1952 (use of a means or facility of interstate commerce to promote or facilitate prostitution); and any attempts and conspiracies to engage in such conduct including, for the account or identifier listed in Attachment A, information pertaining to the following matters:

i. Any and all data, records, communications or information reflecting evidence, fruits, instrumentalities, and contraband of the crimes listed above;

ii. Communications or information reflecting the planning or execution of commercial sex crimes, commercial sex acts, and the movement and use of proceeds of commercial sex and sex trafficking;

iii. Address/phone books or contact information that reflect names of potential criminal associates involved with commercial sex and the movement of commercial sex proceeds, individuals who were prostituted, and commercial sex customers;

iv. Photographs of women or girls in provocative poses, lingerie or naked women or girls;

v. Photographs and information reflecting the various locations where commercial sex activities occurred;

22

      vi.  Photographs and information reflecting the commercial sex lifestyle and how the proceeds from commercial sex were used;

    vii.  Data, records, and communications relating to force, fraud, and coercion, including the possession and use of firearms and physical violence.

b.  Credit card and other financial information including but not limited to bills and payment records;

c.  Evidence of the times the account or identifier listed in Attachment A was used;

d.  Evidence of user attribution, showing who used the email accounts;

e.  Passwords and encryption keys, and other access information that may be necessary to access each account or identifier listed in Attachment A and other associated accounts;

f.  Evidence indicating the account owner's state of mind as it relates to the crime under investigation; and

g.  The identity of the person(s) who communicated with the user about commercial sex, including records that help reveal their whereabouts.

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Eastern District of Virginia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| | ) | |
| | ) | Case No.  4:20sw |
| Accounts described in Attachment A Stored at | ) | |
| Premises Operated, Maintained, or Controlled by a | ) | |
| Company Described in Attachment A | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:
   See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
   See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____ *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.     ❏ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Douglas E. Miller_____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*     ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:     03/23/2020 2:00 pm _____          _____
                                                                                      *Judge's signature*

City and state:     Norfolk, Virginia _____          Douglas E. Miller, United States Magistrate Judge
                                                                           *Printed name and title*

## ATTACHMENT A

## DESCRIPTION OF LOCATION TO BE SEARCHED:

This warrant applies to information associated with the following accounts:

      **a.** luciocole751@gmail.com

      **b.** echotree71@gmail.com

The above accounts are stored at premises owned, maintained, controlled, or operated by Google, LLC., a company headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043.

## ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED:

**1.    Information to be disclosed by Google**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, Google is required to disclose the following information to the government for the account listed in Attachment A:

a.   All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, alternate email address, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

b.   The contents of any and all emails stored in the subscriber's Google account;

c.   All records or other information stored by an individual using the account, including address books, contact and buddy lists, pictures, and files;

d.   Any Google Voice telephone number and associated records to include contact list, call detail records, and content of text messages;

e.   Associated Google Hangouts to include contact lists and content of all messages;

21

   f.  All records pertaining to communications between Google and any person regarding the account, including contacts with support services and records of actions taken.

## 2.  Information to be seized by the government

   a.  All information described above in Section I, including correspondence, records, documents, photographs, videos, e-mail, chat logs, and electronic messages that constitutes evidence of violations of 18 U.S.C. Section 1591 (sex trafficking by force, fraud, or coercion); Section 1952 (use of a means or facility of interstate commerce to promote or facilitate prostitution); and any attempts and conspiracies to engage in such conduct including, for the account or identifier listed in Attachment A, information pertaining to the following matters:

      i. Any and all data, records, communications or information reflecting evidence, fruits, instrumentalities, and contraband of the crimes listed above;

      ii. Communications or information reflecting the planning or execution of commercial sex crimes, commercial sex acts, and the movement and use of proceeds of commercial sex and sex trafficking;

      iii. Address/phone books or contact information that reflect names of potential criminal associates involved with commercial sex and the movement of commercial sex proceeds, individuals who were prostituted, and commercial sex customers;

      iv. Photographs of women or girls in provocative poses, lingerie or naked women or girls;

      v. Photographs and information reflecting the various locations where commercial sex activities occurred;

22

      vi.  Photographs and information reflecting the commercial sex lifestyle and how the proceeds from commercial sex were used;

     vii.  Data, records, and communications relating to force, fraud, and coercion, including the possession and use of firearms and physical violence.

b.  Credit card and other financial information including but not limited to bills and payment records;

c.  Evidence of the times the account or identifier listed in Attachment A was used;

d.  Evidence of user attribution, showing who used the email accounts;

e.  Passwords and encryption keys, and other access information that may be necessary to access each account or identifier listed in Attachment A and other associated accounts;

f.  Evidence indicating the account owner's state of mind as it relates to the crime under investigation; and

g.  The identity of the person(s) who communicated with the user about commercial sex, including records that help reveal their whereabouts.

_____